We will hear argument next in Case 2440, Minerva Surgical, Inc. v. Hologic, Inc. Mr. Hockman? Mr. Chief Justice, and may it please the Court, the Patent Act doesn't provide for a sign or estoppel, and never has. In fact, it says invalidity shall be a defense in any action. That's essential to the fundamental patent bargain. The public grants exclusive rights, but only to the extent inventors publicly share useful advances in knowledge. Accused infringers who prove a patent is invalid vindicate the right of all to make and use and sell unpatented products. Hologic says Congress didn't have to write a sign or estoppel into the Patent Act. It reads this Court's 1924 decision in Formica as having settled the sign or estoppel into patent law. We don't think that's what Formica did, but it doesn't matter, because the world didn't stop in 1924. In 1945, this Court allowed an assigner to invalidate a patent in Scott Paper. That's squarely contrary to a sign or estoppel. In 1947, in Katzinger, this Court confirmed that Scott Paper meant an assigner was free to challenge the validity of the patent. And Lear, looking back on the state of the law before 1952, said that this Court had by then undermined the very basis of any general rule of patent estoppel. The logic of this Court's decisions require abandoning a sign or estoppel. Exposing bad patents is vital patent law policy, and allowing assigners to do so carries no meaningful cost. No reliance interests stand in the way of eliminating this anomalous doctrine, and a patent law-specific limitation on the rights of assigners is nothing like claim preclusion or issue preclusion or even equitable estoppel, which are generally applicable rules woven into our basic notions of fair and efficient litigation. At the very least, an inventor should be allowed to show that the assignee is asserting a claim broader than what the inventor adequately described and enabled. Not even estoppel by deed, a sign or estoppel supposed model, supports preventing challenges that appear on the face of the patent. And when, as here, the assignee, not the assignor, prosecuted the relevant claim nine years after the patent rights were sold, and did so to prevent competition from the assigner's new improved device, a sign or estoppel is particularly at odds with patent law policy. This Court shall order the Federal Circuit to consider Minerva's section 112 involving the argument on the merits. I'd be happy to take any questions. Thank you, Mr. Hockman. I want to focus a little bit on your policy argument that getting rid of a sign or estoppel would help get rid of bad patents, and encouraging inventors to challenge particular claims. But I thought strong patents was the way we encourage invention, and that a sign or estoppel helped ensure the strength and stability of those patents. How do you sort out those competing policy arguments? Well, I think the main policy point is that our patent system absolutely believes in encouraging innovation, but as I referred in my opening to the patent bargain, there's a bargain on the other side. The inventors have to provide, among other things, description and enablement of what they've done. They have to give that to the public in order to get the benefit. And our patent system depends on challenges to validity to make sure that we don't overprotect. We don't provide the benefits of patent exclusivity without the parties doing all the things, without the inventors doing all the things necessary to earn that substantial public benefit. That includes the time-limited nature of the exclusivity in Scott's paper, and it includes, among other things, the written description enablement issues involved here. So it's true that a sign or estoppel leads to challenging bad patents, but that strengthens the overall policy of the patent system and corrects and helps correct for the over-patenting that is built into the system and has been discussed by scholars for a long time. Counsel, if we do not agree with you that we should get rid of a sign or estoppel altogether, do you have any complaints about the position of the United States on how to limit it? Yeah, I think we would certainly prevail on the position of the United States. I think the most important thing to say about the position of the United States is that we do not agree that this court should simply send it back to the federal circuit to figure out whether a sign or estoppel should apply in this case. This court should do that in this case for a number of reasons. First, it's exceedingly important that the sign or estoppel issue, which is a threshold question, it's going to open up or close a complicated question about validity that involves experts and litigation and all sorts of other costly litigation processes. It's important that that issue be decided clearly and decisively early on in the case. Thank you, Counsel. Justice Thomas? Yes, thank you, Mr. Chief Justice. Counsel, you said that you could not compare a sign or estoppel to concepts such as issue preclusion or claim preclusion, et cetera. You distinguished them, but I don't think you demonstrated why those principles, which do not appear in the Patent Act, are applicable or acceptable, but a sign or estoppel does not. Yeah, so thank you, Justice Thomas. Our argument with respect to that is we don't dispute that there are times when common law principles inform the background assumptions against which Congress legislates. It's just not everything in the common law, and it's not every common law principle. And issue preclusion and claim preclusion, I think, are maybe unique, both in the length of which they've been part of the common law and the uniformity with which they have been adopted, not just in patent cases, and not need to be adapted to patent cases, but are applicable generally across the board. I would think issue preclusion and claim preclusion is a background assumption of every statute, every cause of action Congress writes, unless it says otherwise. This Court, for more than 150 years, has said those doctrines are implicit in the notion of a fair and efficient judicial system. A sign or estoppel is nothing like that. Well, Petitioner here, I'm interested in clarification more than anything else on this point, but Petitioner here has signed a certain patent. There were changes to that, and I didn't quite get how much the patent was changed or continued. If you could help me on that, I'd appreciate it. Yeah, and for this, it would help if you could turn to the Joint Appendix on page 833, the Supplemental Appendix, that's the patent. And then maybe put a finger in the same Supplemental Appendix 903, which is Claim 31. Here's the difference. Their position is that their patent, which is Claim 1, it's column 19 at page 833. I'm going to focus on the second paragraph there, which has the term applicator head. The dispute is whether an applicator head, the part that comes into contact with the endometrial lining, it can be moisture permeable, has to be moisture permeable, or can be moisture impermeable. Their invention, their patent says, has been construed to allow a moisture impermeable applicator head. Now, they have exactly one thing they point to that they say suggests that the inventor, Chaba Trukai, when he originally filed his application, had the same thing. And they point to this page 903. And you'll notice the most conspicuous and obvious thing about this is that the term applicator head isn't even in that claim. It's not even there. And I hasten to add, if you go back to 833 and you go down about line 13, it says that when the applicator head is in its expanded state, it's configured to form to the shape of the uterus. So it's coming into contact. That claim limitation is also not in Claim 31. So what they have is a claim where a moisture impermeable device traps moisture by conforming to the shape of the uterus and traps moisture there. And they're saying that Trukai did that as well. And there's simply nothing, nothing at all in Claim 31 that even remotely suggests that moisture should be trapped. Thank you, Counsel. Justice Breyer? Thank you. Counsel, I assume with me that there's quite a lot of precedent in favor of some form of the doctrine. Now, you want to abolish it entirely, but we have many briefs that suggest not entirely, but limited. Which set of limitations, in your opinion, would be the best? And in particular, as the Chief at House, what's wrong with the limitations set forth by the government? Well, I'll start with the government's position. I don't want you to go back to do nothing. I've got that point. I want you to choose among them. Understood. Understood, Justice Breyer. I'm going to start with the government's position. My fundamental quibble, and it's really in this case a quibble with the government's position, really turns on how to implement this materially identical. I think that's a pernicious introduction of ambiguity in the application of the doctrine. Here's how I understand the government's position. This may help. The government seems to be focused on ensuring that if an inventor has made a genuine representation that his invention encompasses as much as the assignee ultimately obtains. That the inventor should be held to that. And my concern is that if you go back to the estoppel by deed roots of this, the kind of genuineness, the kind of representation has to be rock solid. It has to be truly firm. A warranty deed accompanied by a seal is a special kind of assertion about a true fact in the state of the world in all of the law. And to allow debates over the scope of never issued patent claims like application claim 31 at joint appendix 903 is to introduce a completely different sort of ambiguity into the process than has any kind of basis for an estoppel. So I would say it should be very, very close to textual identity. And importantly, I would also add, and the government is a little ambiguous about this, it has to have been pending both at the time the party against whom the estoppel is asserted assigned away the rights, and the party who is asserting the estoppel obtained the rights. In other words, it has to have been a representation that was made, and actually somebody looking at the patent file at the time thinks it was still being made at the time of the assignment. Justice Alito? Well, my fundamental question is why is this a question for us and not a question for Congress? It's a question of statutory interpretation ultimately. There's precedent supporting the doctrine in some form. The Federal Circuit, which is the court that Congress created to deal with these issues, has worked out a body of precedent on it. There are policy arguments in both directions. There are potentially influential supporters of both sides of this argument. Why should we get into this? Would we not have to overrule some of our precedents to do what you ask? No, Justice Alito, I don't think you would. The only precedent that is even purporting to require being overruled is Formica. And remember, Formica allowed a party, an assignor, to use prior art to narrow the scope of the claims. The government agrees that today that's an invalidity argument. This is exactly the kind of doctrinal dinosaur, as this court said in Kimball, that you abandon, that you give up on. Lear and Scott Paper have already done all of the work. Do you think Kimball's approach to statutory decisive supports you here? I actually think it does, Your Honor, because I don't think you have a square holding in Formica in favor. As we've argued in our brief, and we can get into this if you want, we read Formica exactly the way the United States read Formica in the Katzinger case as providing only implied approval. This isn't the kind of precedent that you have to treat as settled because it doesn't appear to have been settled. And I would emphasize also, Scott Paper, as this court said in Katzinger, expressly allowed, already did the work, expressly allowed an assignor to challenge invalidity. It is exceedingly difficult to come up with a principle, Lear said it's impossible to come up with a principle, that can constrain the rationale for allowing the assignor in Scott Paper to challenge validity for the reasons asserted there, and any other invalidity challenge. One other question, if I can get it in. Can parties contract around this? Can the assignment specify whether the assignor can challenge the patent or not? Or would that be against public policy in some sense? Yeah, I think this court hasn't squarely answered that question. I think in fairness, most of what this court has had to say on the subject of that question points away from allowing parties to do that, for the same reason that this court has repeated, has so deeply undermined assignor estoppel. This court has said over and over for more than 150 years, for roughly 150 years, going way, way back, saying that it is critical that everyone be available to challenge the validity of patents. Assignors in particular are super well positioned to do that and do the public service of invalidating bad patents and freeing up competition. Thank you. Justice Sotomayor? Your counsel, I will ask the government about the limitations to its proposal. But its proposal is very close to Westinghouse, isn't it? I think that's a fair characterization. In other words, when Westinghouse was decided, patent over-broadness or patent narrowness was an issue that came into claim construction, but now it comes in under validity, correct? It was allowed to come in under validity. There wasn't really a stark difference between non-infringement and validity as there is today, so that the arguments didn't quite reach out that way, but now they do. That's part of the problem, which is things have changed since then. So the ESG's proposal is really to bring things back to where Westinghouse left it, correct? Well, I don't think so, because I think the ESG's proposal, in fairness, is very, very close to our view about exempting Section 112 challenges like ours. Obviously, the attorney for the government will speak to that issue herself, but they say that the threshold question of whether a stoppel can apply in a case involving a 112 issue substantially overlaps with the substance of the 112 issue itself. To be quite honest, I think it is exactly the same, and I don't think there's any space for that. I'll let them tell us if there's a different space. But my next question for you is going back to what Justice Alito started with. There may have been a period of uncertainty between Lear and the Fed's circuit ruling in 1988 that a sign or a stoppel was still being used. Given that Congress did a major overhaul of the Patent Act, was it 2011? Why should we interfere when this type of defense has been approved for such a long period of time? Well, let's not understate the gap. It's 30 years without anybody thinking a sign or a stoppel was the law between Lear and Diamond Scientific. And it would be an astonishing inversion of the judicial hierarchy for this court to infer congressional acquiescence to the Federal Circuit's view on patent law, even while this court's decisions in Scott Paper and Lear had for 30 years left the doctrine dead. I don't think there's any basis for any kind of post-enactment. That would be an uncommon and never-before-seen standard of post-enactment inference. And I also think, with respect, that the Federal Circuit persisted for so long only because the Federal Circuit has exclusive jurisdiction over patent law. Mr. Huckman, I'd like you to assume with me, as you did for Justice Breyer, that there is a lot of precedent for some form of this doctrine, that Westinghouse called it a settled rule, that Scott Paper did nothing more than create an exception to it, and that Lear said that the equities were far more compelling for a sign or a stoppel than for the licensee or stoppel that they eliminated. So let's just say it's a settled rule, and you need some special factor to justify overturning the doctrine under our stare decisis principles. What are your special factors? So I think the special factors are that Scott Paper has already allowed it to happen. As I mentioned, that the argument that the— So what are your special factors for overturning the basic rule? Well, what makes it a doctrinal dinosaur is that what Scott Paper and Formica considered non-infringement arguments are now, as we sit here today, invalidity arguments. Practicing the prior art defense is actually an invalidity argument. Narrowing the claim in light of the prior art is a kind of absolute method of last resort, and in fact is preferred as an invalidity argument. So the law has moved in that respect in a significant way. Lear specifically said that it was not the general rule. But by the time the case of—it's considering licensee stoppel, the idea that patent stoppel was a general rule has already been declared by this court no longer a general rule. So I think under these circumstances— Let me take you to a different place. Let's think about the core application of a signer stoppel. And I guess I want to know why it is that you don't think that this core application makes a lot of sense and accords with our basic principles of fairness. So let's say that an inventor invents something. She obtains a patent. She later sells the patent. And she then argues that the invention was completely obvious all the time and isn't patentable. So the question is, why is it fair to entertain that invalidity argument? It seems as though it's a total bait-and-switch. Right. If it's a bait-and-switch, then you have a traditional equitable stoppel argument. But a signer stoppel is different from equitable stoppel. And equitable stoppel, which this court recognized in SEA hygiene, is available, would apply if in that situation the inventor— Well, I mean, that's semantics, Mr. Hoechlin. That's semantics. Is that a stopped— No, I don't think that is semantics. Is that a stopped, Mr. Hoechlin? If she knew at the time of the assignment that it was invalid and she said, I'm going to sneak this away, then it's fraud. And there's state law remedies, and she can be— Mr. Hoechlin, I just want to know if it's a stopped or not. Sure, it can be a stopped. Okay, now let me ask you about another question, Mr. Hoechlin. So is there a meaningful difference between that case and a case where the inventor invents something, she swears an oath, she transfers the application before she receives the patent, and the final patent is exactly the same as the application? Yes, I think there is. Because, I mean, in that situation, again, if she knew at the time she swore the oath that she breached her duty of candor, then I think you could have an estoppel. But there are also things that you can learn. Justice Gorsuch? Let me come at the problem a different way. It seems to me that we all agree that the common law would have had an equitable estoppel defense here available. And you don't contest that. The question is whether this court should create something more on the basis of Formica and Scott Paper, which I understand the criticisms of. But the SG says we can save the day, we can fix it. And it's going to be more than equitable estoppel, but it isn't going to be that much more. Arms length, valuable consideration, materially identical claims. I want to know what I'm buying there. I know how to apply equitable estoppel. What kinds of questions do you think will arise that this court will have to address if we bless this new revised and improved version of a signer estoppel? Thank you, Justice Gorsuch. My view on this is that the most troubling question that you'd be buying is what to do about the disputed meanings of never issued or the disputed understandings of pending applications for patents, pending patent claim terms. Materially identical. Again, I mean, if it's given a really robust application by this court and it's made clear that it is something in the nature of approaching textually identical, well, then you have, I think, a fairly strong basis for being assured of consistent application. But the risk of inconsistent application, the risk that an inventor never intended something but is later, with the benefit of hindsight and able lawyering as attorneys for Hologic are obviously able lawyers, going back and filling in inferences and assertions about what was written down in an application in 1998 should be understood to mean today in light of everything we know today. I think it's pernicious, and I don't think we should be getting into that. Why would equitable estoppel solve that problem? Because equitable estoppel is focused on actual representations. You need to have an actual representation of what is it, and you also need to have reliance. So because you need both an actual representation and reliance, and we've obviously briefed that we think a signer estoppel, too, requires representation and reliance. So let me interrupt you there, I'm sorry, and just see if I understand the delta here. Most of these cases involve small inventors assigning patents to very large corporations, who are fully capable of examining the patent and may be in a better position to identify its validity, and who undoubtedly very rarely rely on these individuals. And if we require material identically claims and get rid of reliance, we're really just advantaging the large purchasers to the disadvantage of the individual inventors. That's exactly right. I think one of the things that makes reliance so important is that it ensures that there's something akin to a meeting of the minds. Everybody knows at the relevant time what they're talking about. And having to figure that out with the benefit of hindsight, you know, here we are, it's almost— Blowing away reliance requirement just gives a free pass to the large purchasers. Exactly, exactly. Thank you. Justice Kavanaugh? Thank you, Chief Justice, and good morning, Mr. Hochman. Your lead argument in the brief from pages 17 to 41 is to eliminate the doctrine of assigner estoppel, and I guess I want to pick up on Justice Kagan's questions on that. You have Chief Justice Taft, of course, in Westinghouse referring to the doctrine at that point in 1924 as well settled since 1880. And it's continued without elimination since then. So what is—I'm not sure I heard exactly what is the special justification, and particularly in a statutory case, where, as Justice Alito said, our doctrine of stare decisis is especially strong. So why get involved in overturning something that was well settled as of 1924? Because it didn't stay well settled. Because this court, in Scott's paper, very clearly allowed an invalidity claim. Katzinger agreed with that characterization of it. So the result is you actually—the rule of assigner estoppel is assigner cannot challenge the validity of the patent. Scott's paper says the assigner can challenge the validity of the patent. So now we have something that's no longer actually a rule, and Lear already recognized this. So, in other words, this is the kind of, as Kimball says, doctrinal dinosaur. It has been whittled away. It has been—the arguments for it have not only been undermined as a matter of policy. Assigners are available to do a very important public service of exposing bad patents. The argument that Formica sort of gave full consideration, I think that doesn't hold up to inspection. It didn't discuss the relevant statutory language. It didn't cite Pope manufacturing, which was the principal case from this court 30 years earlier that had said— Well, it went through—I mean, I'm looking right at it. It went through a lot of the lower court cases and starts with 1880, and I guess I'm not sure about that. But let me ask you a different question. In the respondent's brief, they say that assigner estoppel has engendered serious reliance interests, which is something we also have to think about. And they say—I just want to get your reaction to—for decades, millions of patents and applications have been assigned on the assumption that assigner estoppel bars assigners from later challenging the validity of the assigned patent rights. I just want to get your reaction to that. Yeah, I think my principal reaction to that is for nearly 30 years, there was no case applying assigner estoppel. Courts had said it was dead. Commentators had said it was dead. And for 30 years between Lear and Diamond Scientific, there was no issue about patent assignments. There was nobody running around claiming that their reliance interests had been undermined. And true, the Federal Circuit's rule has been in place since Diamond Scientific, but there's been no discussion of the magnitude, the notion that parties pay a premium because assigners aren't going to be able to challenge the validity of the patent. It's pure speculation. Mr. Hoffman, I want to ask you about equitable estoppel. So how might equitable estoppel play out in this particular case? Let's say there's no assigner estoppel. You know, you have them alleging that Mr. Truckeye had lied in his inventor's oath and then admitted that after the fact. And then you have this dispute about Claim 31 of his original application being nearly identical to Claim 1 of the later patent. So is there any way that just about a lack of reliance interest, or if you assume that those allegations that your friends on the other side make are true, would there be any case for equitable estoppel here? Yeah, I think the case for equitable estoppel would be dead. I mean, there would be no equitable estoppel argument here at all, respectfully. So first off, there's no reason to believe in 2004 that anybody at Scitech thought or believed they were buying a patent that could cover a moisture-impermeable device. The only thing is they've never said Mr. Truckeye said anything to that effect to them. And the only thing they've pointed to, again, is this application Claim 31. And respectfully, it just doesn't do that. It not only doesn't have the language in their claim. They didn't pick up application Claim 31 and prosecute it. They wrote a different claim. And they did it because it doesn't have the claim term applicator head. The closest thing it has is the term electrode array. And the term electrode array, their view is, oh, because it says electrode array but it doesn't say moisture-impermeable expressly, that means it must cover moisture-permeable. But I don't even know what a moisture-permeable electrode array would be. The electrode array is just the positioning, how the electrodes are positioned on some other part of the product, whether it's called the applicator head or sometimes called the electrode carrying means. Can I ask you something else about the essapel? So, you know, I think that the assigner essapel doctrine, you know, as essapel doctrines often do when they're thinking about fairness, you know, punishes a turncoat assigner, right? And there's something unseemly about representing to the person to whom you're assigning a patent, it doesn't cover this, you know, it's valid, and then turning around and we all see the problem. You suggest that there can really be no reliance because people, especially sophisticated parties as Justice Gorsuch suggests, are doing their own investigation of the patent's validity. Is there any reason why the reliance incurred or why there would be reliance by the parties who are the assignees that could hurt them? I mean, you suggest that they're perfectly capable of analyzing the patent, so they're not going to be, you know, let down the primrose path by the assignor. Yeah, I mean, I think, well, with respect to this issue in particular, Section 112, all you have to do is pick up the patent specification and look at it. And you can find that there's just no explanation at all that could support a moisture and permeable device, so I don't know what they could have relied on under these circumstances. But I also think it's important to note, and one of the things that hasn't come out, is that when you have a patent application, there's all this turncoat concern. Before a claim issues, the patent prosecution process, and both parties agree about this, necessarily involves a lot of give and take with the patent examiner. Sometimes you go back and you do your own further research or further work on the product, and you discover new things about the product, and that requires changing the claim. Sometimes it requires removing claims. Sometimes it requires expanding them. Sometimes it requires narrowing them. A minute to wrap up, Mr. Hochman. Thank you. And just to complete that question, the fact that you have a patent claim that ends up looking different, that the inventor thinks, no longer thinks that what they filed, you know, Paramount Publix and Hoggy and other cases make clear that the inventor oath is not violated by simply deciding that it's not a viable patent. Look, as this discussion makes clear, a signer estoppel is a doctrinal dinosaur. We should abandon it. But at a minimum, no plausible justification supports applying a signer estoppel here. Allogic chose to draft and prosecute its own broad claim that finds no support in Truchi's then 15-year-old specification, and it did so precisely because it wanted to frustrate competition from Truchi's latest innovation. Having gone beyond the specification, it has also gone beyond the range of any even arguable estoppel, as a matter of equitable estoppel or any other kind of estoppel. This court should not allow a signer estoppel to be wielded as a sword to frustrate legitimate competition. Thank you, counsel. Ms. Ratner? Mr. Chief Justice, and may it please the Court, as Petitioner has explained, the Federal Circuit's test for a signer estoppel is too broad. That court prevents an assigner from challenging any claim relating to an assigned invention, even if that claim looks nothing like the claims that existed at the time of the assignment. That's not how estoppel ordinarily works. The foundational requirement for estoppel is inconsistency, and an assigner acts inconsistently only when the claims it challenges at time two are the same as the claims it pulled at time one. But while we agree with Petitioner that the Federal Circuit got it wrong, we don't agree that this court should get rid of a signer estoppel altogether. Lower courts have applied the doctrine for 140 years. This court approved it in 1924, and Congress hasn't seen fit to eliminate it over all that time. A signer estoppel can still play an important role, but only if it's limited to a true estoppel doctrine reflecting its origins in estoppel by deed. I welcome the Court's question. Ms. Ratner, you say that the Court should only apply a signer estoppel where the assigner sells patent rights for valuable consideration. How do you tell what valuable consideration is? Our basic point here, Mr. Chief Justice, is that if there are circumstances in which someone agrees to transfer any rights to an invention before that invention exists or before any bargaining over the value of that invention, then you can't really be said to implicitly represent that that invention has value. I'm sorry, go ahead. It's that implicit representation that there's value that's really the key to a signer estoppel. So the familiar process where a company hires an employee in a technical or whatever area and the employee signs over inventions that they may discover in the course of their employment to the employer, that would be or wouldn't be valuable consideration? We think that whether that would be valuable consideration in terms of a legal aspect of contract law, we don't think that would be sufficient for applying a signer estoppel because if employees have agreed up front to transfer any inventions and leave it to their company to figure out whether there's something patentable there and pursue patent rights, then you wouldn't have any sort of implicit warranty that what that employee is transferring is patentable and valuable. Justice Thomas? Thank you, Mr. Chief Justice. Counsel, could you give me your best take on the difference between what was originally assigned and what respondent has now? Sure, Justice Thomas, although I would emphasize this is exactly the question that we think that the Court of Appeals should address because there are really three questions here. The first is, which is the relevant assignment? There was an assignment from Truckei in 1998 to Novacep, and we don't really know the circumstances of his continued relationship with Novacep. To know whether the next assignment in 2004 is also relevant. So the Court of Appeals has to figure out which of those two assignments and then what claims were pending at the time. And at the time of the 98 assignment but not the 2004 assignment, there was this Claim 31. And then the question would be, we think, is Claim 31 essentially the same as Claim 1? And I think Petitioner has pointed to some reasons why it might not be. But again, we would leave the Court of Appeals to sort those out. Thank you. Justice Breyer? My question is really the same as the Chief's if you want to say anything more about that. But I have a second question, which I'll say what it is, is what I'm having trouble doing. I can understand abolishing it. I can understand keeping it. But limiting it, I'm finding trouble in finding the right way to do that. Why? Well, Smith invents a widget. He goes to another company, having assigned the widget to the first company, and the second company wants to go ahead and sell widget prime. First company sues. And what they want to argue, perhaps like here, is wait a minute. What we want to make has nothing to do with that patent. Oh, no, it does. Go look at the claims. Well, it can't because if it did include widget prime, the patent would be unlawful. So you see it can't. Well, says the Fed Circuit, you can't argue that. You're attacking your own patent. So I think, my God, they're foisting this invention on the public forever, and they can't argue even something like that. And they can't even make widget prime. Do you see the problem? I do. And how are you solving that? I think we're solving it in two ways. There are two basic questions that we think need to be addressed before a signer sample is applied. The first is, is this a real transaction? That's the discussion I was having with the chief. Is this the type of transaction that someone might be said to be making implicit warranties? Is this sort of an arm's length sale between party A and party B? And that could knock out any circumstances like an employee who agrees up front to give anything intended. And then the second is, is there a match between what someone said was valuable at the time of the sale and what's at issue now? And we think if after a patent rights are assigned, that the assignee goes out and gets extremely broad new patents, then the price for that is they have to defend the breadth of that claim against the world, including the person who assigned those claims. Justice Alito? Where does your theft come from? Is it just what you think is good policy? No, Justice Alito, we do think it is good policy, but we also think that it derives both from this court's decision in Westinghouse and before that from basic principles of estoppel by deed. And there has been a lot of discussion about equitable estoppel here, but I think it's important to remember that at common law, estoppel consisted of estoppel by deed, estoppel by conduct, or estoppel by record. Estoppel by conduct is what we now think of as equitable estoppel. And these are the basic principles, we think, that control the estoppel by deed, such that what we're trying to do is really apply a patent-specific version of estoppel by deed. If you would think about the second prong of your test, what decision of the federal court has applied that prong? There isn't a decision. This is the question that the court left open in Westinghouse, and I think Westinghouse identified the problem. It said, look, it may be harder to know whether to do estoppel when this is a pending patent claim as opposed to an issued claim, and so we're trying to answer that question with the reasoning of Westinghouse and, again, estoppel by deed. And we think the answer is, well, that pending claim has to look like or be essentially the same as the issued claim that you're now saying is invalid. Thank you. Justice Sotomayor? Counsel, Petitioner's Counsel tried to do amendments to your proposal. Could you respond to those, number one? And number two, am I clear that you're really not trying to return completely to Westinghouse because Westinghouse seemed to suggest that a court assigner estoppel would reach questions of overbroad claims, and your test doesn't reach that at all, meaning you would just look, it seems, as to the claims as claimed at the time of assignment and those issued in the patent, and you don't even get to the question of whether or not, Justice Breyer's question, whether or not that reading is overbroad? So on your first question, Justice Sotomayor, in terms of petitioner's limitation, I think we are fine with the requirement that this be rock solid. I mean, we chose the term materially identical and think that means something. And as for the second proposed limitation, they suggested that there should be, that claim should exist both at the time of the assignment from the assignor and at the time of the assignment to the person ultimately bringing the challenge. That limitation we don't agree with. We think this is focused on the assignor's representation. As to your second question about claim construction, it's true that claim construction has, I think, changed to some degree over time. Prior art can still be relevant in narrowing a claim, but only under a canon of essentially narrowing an ambiguous claim to preserve validity. What we don't think is still viable anymore is sort of a freestanding practicing that prior art defends. Well, that somehow, that, in my mind, gives credence to petitioner's counsel that maybe the doctrine has lost its utility. Because Westinghouse was really premised on a claim not dissimilar from this one, that if you read the claim in context, it would be overbroad to the description in the other claims. But you've just admitted that things have changed. How you read patents has fundamentally changed. I think it has changed to some degree, Justice Sotomayor, but that doesn't change the ultimate point of Westinghouse, which was you can't have a core attack on the value of something, the validity of something that the day before you may have implicitly represented has value. Justice Kagan? Ms. Rodner, you give three examples in your brief of places where you think under your reformed doctrine, assigner estoppel wouldn't apply or might not apply. It's pre-invention assignments, continuation applications, and changes in the law. Is that it? Is that sort of an exclusive list, or do you have other to add to it? So, Justice Haynes, I don't have others that I'm hiding from you. I don't want to say it's exclusive. If there's some other unusual circumstances that would arise, it would undermine the basic notion that what someone is saying at time two is inconsistent with what they're saying at time one. But you think those three are basically the world of cases in which that's true? That covers the cases that I can think of, yes. Okay. Mr. Hoffman said when I gave him what I consider to be the sort of paradigm cases of assigner estoppel and asked whether they should be estopped, he said yes, but they should be estopped under the equitable estoppel doctrine. And I take it what that would do for him is that it would impose a reliance requirement and that it would impose a sort of extra special affirmative clear representation. So there could be nothing implicit about it. Maybe he wouldn't rely on the oath. I'm making this up a little bit. But I guess the question is what's the difference between equitable and assigner estoppel in your mind as to these paradigmatic cases, which we think of as bait and switch cases, and does that difference make a difference? I think you've put your finger on the two main differences. The first is a knowing affirmative misrepresentation, and the second is justifiable reliance on it. And we do think that would make a difference. It would be extremely difficult to show that in most cases, and this court in Westinghouse specifically said, look, that's estoppel by conduct. That's not estoppel by deed. That's page 351 of Westinghouse. And so I think the court has already made clear that that's a different branch of estoppel doctrine, and what we're getting at here is not necessarily about one party misleading another as much as confidence and conclusiveness in a particular type of formal transaction. Thank you. Justice Gorsuch? Ms. Ratner, as I understand it, no courts ever apply the version of estoppel that you're proposing now. And so I guess my first question is, why doesn't it face the same stare decisis challenges that the petitioner has? So that's one set of questions for you. Second is, with respect to the choice of relying on estoppel by deed and the liability, it allows your test would allow liability, even when there's no misrepresentation of fact and the buyer, often in these cases, large and sophisticated more so than the seller could easily determine the validity of the patent on its own and is better positioned to do so. And you also get rid of reliance. And I guess I don't understand why we would impose liability on statements that even you degree were utterly meaningless at the time. And all that points to my third question, and then I'll stop. And that is, if we're going to look at estoppel doctrine, I guess I'm a little confused why we look to real physical real estate as the example where deeds recorded, these have a special role in our, in our system and have a special validity rather than personal, personal property where these elements misrepresentation of facts and, and reliance are required given that patents are so easily killable and challengeable in ways that physical real estate much harder to do. So, so those are my three questions have Adam in any order you want. Sure. I'll take them in order. First, in terms of starting to say this, we do think that we're applying the rationale of Westinghouse to the one area that the Westinghouse, but you do agree that no, no courts ever apply to anything like the test you're proposing, right? That's correct. Your honor. Okay. So let's move on to the second one. The second one, I would strongly resist the idea that we're suggesting you get rid of reliance. We're talking about a different branch of estoppel doctor. And again, this court made clear in Westinghouse, which brand you say no reliance is required to prove your version of a sign or a stopper, right? Correct. Because no, no, no just of course, such because reliance is an aspect of a stopper by conduct. It's not, so you're just saying you're getting rid of it in this area. You're not getting rid of it everywhere. I accept that, but you're getting rid of it here. And, and I guess I'm just curious why, why we would get rid of that and the material misrepresentation of fact in, in this particular context, and why the analogy to the deeds and real, real property makes sense more than, than a personal property. So I point you to page three 51 of Westinghouse and page 902 of the Fox decision, which was the first decision. Yes. But if we're, if we're modifying and we're doing something nobody's ever done before, why not get it right? Well, I think those give the reason the honor, which is we're talking about a particular formal transaction here. And the point here is to, well, the contracts, the formal transactions, there are lots of formal transactions. The point, the point is to preserve the conclusiveness of these transactions, just as they would be preserved. If this, if this were real property. And I think it's for personal property, but there might be other things like a warranty of merchantability that would also prevent someone from saying at time one, this thing has value. And at time two, that it's valueless justice. Thank you, chief justice. Good afternoon, miss Ratner. I want to follow up on the three examples on page 20 of your brief that justice Kagan was referencing and focus in particular on the first one and make sure I understand what you're saying. Exactly. The brief says, if an employee assigns to his employer, all patent rights to any inventions he may develop in the course of his employment, the assignment generally would not imply any representation as to the patentability of particular inventions. And I want to know what you mean by the word generally, or what's, what's captured there and what's not captured there. Our point is the same one that I made earlier to the chief justice, which is, is this the type of sale or assignment where someone might be said to implicitly represent that the patent rights have value. And it's easy to see that if we're talking about an arm's length sale between a and B, if we're talking about an ex ante assignment of any inventions that haven't yet even been invented, then you don't have that sort of suggestion or implicit warranty that there's value there. Why do you say generally, instead of not always then I say generally, because we're talking about equitable doctrines where there can always be specific situations that I haven't thought of and that we don't want to foreclose analysis of. Okay. There's nothing you're thinking of though. You just want to be careful not to foreclose it. As I said to justice, I'm not intending to hide anything in the paragraph on this page. And then petitioners object to the phrase materially identical. And I just want to give you an opportunity to respond to that again. Yeah. Again, the stuff that they're talking about a rock solid, I think it's the phrase petitioner used a rock solid textual similarity. We're perfectly fine with that. Our point is that there may be some minor changes in paragraphs or in commas or in an unimportant term that doesn't actually change the claim limitations. And if that's the case, we don't think that should undermine the application of a signer estoppel. Thank you, Mr. Justice Barrett. Good afternoon, Mr. Ratner.  here is just as prior pointed out, you know, we can keep, or let's just assume for the sake of this argument that I agree that stardecisis establishes that the assigner, uh, uh, center document exists. We have a choice between two bright line rules. Either we have it or we don't, or we can do this middle course that you're charting that as you say, no court has applied before. It seems to me that your approach doesn't give us the efficiency of, uh, of estoppel doctrines generally. I mean, if you think about blunder tongue patent context and, you know, a sample, their issue issue preclusion shuts it down and makes litigation more efficient. But here, as I take it, your proposal would probably admire the parties and fights about what's materially identical. I mean, would that be a battle of the experts? So I think as an ordinary sense, no, if we're talking about the simple assessment of our, are these claims under the same claim limitations or other extra claim limitations added, we think that could be done in a relatively straightforward way. But I would add to the extent there are some factual questions here. We think that that's a benefit of our theory. The problem of the, with the federal circuit theory here is that it basically treats the application of an equitable estoppel principle as an on off switch. And, and that's the underlying problem that we're trying to resolve. How much are you driven by stare decisis here, as opposed to if you were starting from scratch, this is what you would propose that the court adopt. I think that we are probably somewhere in between those two things. Given the long period of time in which a signer estoppel has existed and in which Congress could have acted, we give greatly to that. That said, I do think that the historical analogs here still provide support from that. If we were for the doctrine, if we were deciding in the first instance, thank you a minute to wrap up. Thank you, Mr. Chief justice. I guess I would just emphasize what we think is the core advantage of our test. And that's that it puts intellectual property on par with other kinds of property. Whereas the party series, it would create a mismatch in one direction or the other. So Minerva on one side wants to eliminate a signer estoppel altogether, but that would be in that sales of real property are protected by established by deed and personal property may be protected by warranties of merchantability, but there would be no analog for intellectual property. And on the other side of the federal circuit and who logics would apply a reflexive rule that covers all invalidity disputes. But as we've discussed, that would mean that a sample applies even in the absence of logically inconsistent positions. And that's not consistent with historical estoppel doctrines. So we think that our approach here is most consistent with Westinghouse with that historical development of a signer estoppel and with the Thank you. Thank you, miss Ratner, Mr. Wolf. Thank you, Mr. Chief justice. And may it please the court. In 1924, this court held that as an or a stopper was manifestly intended by Congress. In the a hundred years since Congress has maintained the relevant statutory language through multiple revisions of patent law. This court has explicitly refused to overrule the doctrine and dozens of Including recently in diamond scientific, which explicitly incorporated the claim construction doctrines of Westinghouse, but never asked this court to disregard all of this. And the service of the purportedly paramount goal of eliminating bad patents, but patent laws have other critical objectives, including incentivizing scientific progress through the protection of patents and fostering predictability and commercial transactions. The logic respectfully submits that if the costs and benefits of action were to be reweighed, it should be Congress handling the scales, whether couched in the principles of starting a site, just a ratification. This court should not undermine the hundreds of thousands of still extant bargains struck against the backdrop of that. The bargain in this case included Mr. And his co-inventors expressly selling the rights to future patent applications. The parties valued those rights based on the understanding that responded with secure, whatever claims the patent office would allow in this case, a claim just like the one that Mr. Successfully secured an allowance of with original claim 31. And that Mr. Would not subsequently challenge their validity. And if Mr. Wanted a different deal, he was free to contract around apps Norris topple per mentor graphics and accept it. Concomitantly reduced purchase price, but Mr. Now wants to keep both the $8 million he pocketed and the right to undermine what those millions purchased. The inequity of that position has been apparent since the founding of this country. And the doctrine of apps Norris topple born from that recognition should not be cast aside. Mr.  you began by talking about starring decisive and cited some authority for it, but. You have to weigh against that. Don't you? The court's description of a signer is topple as a failure and the court statement that to whatever extent that doctrine may be deemed to have survived for Mike, a decision or to be restricted by it. It's not controlling. So it's, it's not the strongest star decisive argument. Your honor respectfully in, in Scott paper, this court considered whether or not to reverse Westinghouse and expressly said it was not doing. So rather it created a narrow exception based on this court's long held concerns about temporal expansions of patent monopolies. And we are respectfully to the court. In that case, there was really no discussion of starry decisive. There was no discussion of congressional intent. And as was noted earlier, the court specifically held or noted that the estoppel in the action or context was far more compelling than in the licensee context that Lear addressed. So while there has been critical language, when the court explicitly refuses to overturn a case, there's no conclusion other than it remains good law. I'd like to see if there's a difference between your position and that of the solicitor solicitor general, in particular for the person who enters employment and signs a general assignment of all her inventions to her employer. Does equitable or a sign or a stop will apply in that case? Well, obviously your honor, that's, that's not our case. We're not an employee employee, employer employee context, but I wasn't, I wasn't confused about that. Yes. Your honor. Apologies. I would suggest that that employers pay employees for research and development. They provide the resources to perform that research and development. It is not inequitable for them to expect that the fruits of that research should be given to the employer. So I think we do disagree at least to some degree. I mean, I, I can think of circumstances where an employee would not be stopped putting privity issues aside, for example, if they refuse to sign the oath, but there is some daylight between our position and the government's position in that regard. Thank you counsel justice Thomas. Thank you, Mr. Chief justice counsel. It seems as though your view of a sign or a stop, or begins to approach the assignments that one would require from an employee. It seems. So how far would you go from the original assignment? Would you, in this case, in the current case, the, we're talking about a patent that is quite different from the original patent. Respectfully, your honor, we, we disagree very strongly. Mr. Chakai, and this is at J a four 49, a trial acknowledged that at the time he filed his application, he did. He thought that he was entitled to a claim without moisture transport. He fought for claim 31 and succeeded in attaining claim 31 that did not have much moisture transport before the assignment. And so when Hologic took this portfolio over, when they were assigned it, they had express representations from Mr. Chakai that he was entitled to the very claim that they now say we're not entitled to. It was only after the fact that he purportedly changed his mind and realized the error of his ways. And of course that kind of a, um, financially induced change of memory is precisely the kind of morass that asked more estoppel is designed to avoid. Um, you say that if there are any changes to a stop, a sign or a stop, it should be done by Congress. But couldn't you say that, uh, that if you want a sign or a stop, oh, Congress should amend the patent act. Respectfully, your honor, we believe that backwards when in Westinghouse, this court said that asked for a stop was manifestly intended by Congress. Uh, one, that's pretty strong language. Uh, Congress in 1952 noted when the Supreme court weakened contributory infringement, for example, and emphatically, uh, rejected the Supreme court's rejection. And I'm not sure that's appropriate legal language, but in any event, uh, this, the Congress was put on notice of the Supreme court's view of its intent and how it understood the assignment provision. And it re ratified it in 1952. And then in 2011, 2012 with the American events act, which wholesale change certain provisions of patent law. Uh, it once again, just reiterated the assignment provision as is, but it seems as though you are, you want, uh, Congress by statute to make changes to something that doesn't appear in the patent act. I did. So I don't know how that's backwards to say, well, maybe Congress should, uh, uh, amend the patent act to include a sign or a stop in the first instance. Your honor in Kimball, for example, this court noted that starry decisive supplies, regardless of whether decision focused only on statutory texts are also relied on the policies and purposes animating the law. So whether or not one views the holding of Westinghouse as expressly construing section two 61 or, uh, understanding the animating policy behind two 61, either way it's subject to the same deferral to Congress and it should be up to Congress to change it. Thank you. Justice Breyer. How do you respond to what I've gotten out of some of the briefs? Um, there is precedent has problems, but 80 years old, a hundred years old, let's change one employment practices. You see that general assignment go to work somewhere else in the new company is afraid to go anywhere near it. Second nature of invention, artificial intelligence, robots, da, da, da, da, da. Okay. Third complexity and complexity means this widget patent assigned to a go to work for B B widget prime. Hey, Sue's B all he wants to argue is of course the patent on widget doesn't cover widget prime because if it did, then since it wasn't described properly and couldn't be practiced by someone, there wasn't enough information. The patent would have been unlawful. Okay. No, says the federal circuit. You can't even argue that result, result extension of many important patent monopolies, which shouldn't be there and which in fact will cost the public, let alone advances. And you can imagine that right now I may have overstated it. That's how I'm understanding it now. So they're saying do something. One side says there's nothing you can do except abolish it. Others say limited. I want to hear your response. Your honor. I have a number of responses to that. Uh, that, uh, the notion of how the world has changed. First, of course, Westinghouse itself was an employer employee case. So it's changed in an amount, but not in kind. Secondly, one thing that has changed, uh, is that the P tab through the America invents act, uh, now allows an inventor to challenge the very thing you are concerned about, whether it be a matter of prior art or under post-grant review, it'd be a matter of issues of written description or enablement. Uh, we also, your honor has your question hinted at privity issues. And of course, uh, there is, uh, if, if, if an employee goes from company A to company B and is not sufficiently, uh, uh, directing the activities, uh, then the privity would break the chain. Uh, the privity analysis would break the chain and you would not have asked nor estoppel. And finally, there are, as I noted before, if the inventor thinks that the way company a characterized his or her invention is not right, uh, he or she can refuse to sign the oath. And in that case, again, you raise the prospect of breaking the chain. But if an employee at company a turns around and for example, found the company to compete against the very work he or she did, uh, that I think offends our traditional notice, uh, notions just as much today as it did a hundred years ago. Justice Alito. I have no questions. Justice Sotomayor. Counsel, I'd like to pursue justice Breyer's question on one level. Okay. You're resisting any limitation to a sign or estoppel, but as, but there is a fairness element that you're not, um, responding to, which is if a sign or estoppel isn't tethered in some way to the scope of the rights that were actually it's a sign, then I don't know why it's fair to a stop and a signer from seeking to invalidate something or she did not actually assign. So for example, if the original Oh 72 application had only one claim that required moisture permittability, but later you change if Mr. Truckeye assigned the patent that way and you revised it, deleting that reference. Why should Mr. Truckeye be stopped? You did something that he didn't attest to that wasn't, um, within the claim specified. What sense does it make not to let him raise that defense? Yeah. Three responses, your honor. First off, from the reliance perspective, uh, he was paid and Nova step was paid 325 million. He personally pocketed 8 million against the backdrop of the current ethanol or estoppel regime. So whether you want to call this a reliance interest or a fairness interest, it's the same interest, which is he, he, he was paid knowing that logic would get what it would get from the patent office. And now having pocketed that money, he says, well, I want a different deal. So that's, that's a different component of fairness. I'm sorry. He pocketed money on a deal that included just one item. You've been changed. Are you saying he pocketed money knowing you would and could change it? So you're just out of luck. I wouldn't phrase it as out of luck, your honor. And you, I'm assuming the facture is saying, obviously we disagree with some of the premises of what petitioner has said, but assuming the hypothetical, uh, as diamond scientific noted, what you're buying is the full scope of what the specification will bear. There is no dispute in this case that everything that's in claim one, the infringed claim is identified in Mr. Chakai's application. What he asserts is that it wasn't novel. It wasn't new. Well, if he was right, he is free to rely upon Westinghouse and diamond scientific claim construction principles. But we know in this case, he's wrong. And we know he's wrong for two reasons. First, the patent office originally allowed claim 31. And second, they tried to institute an IPR against claim one and they didn't even achieve institution. So, um, the fairness here, um, we agree that there are issues of fairness, but if you're going to rebalance the equation that is for Congress, not the courts to do that balancing justice. Mr. Wolf, you just talked to justice Sotomayor. And before that to justice Thomas about this case and how we should understand things to have played out over time. But let's just assume a hypothetical case and, and I'm not meaning it to have any necessary relationship to yours. Um, and the hypothetical is an inventor who assigns an application and then the assignee broadens the patent claim beyond anything that the inventor would have thought patentable in the first instance. Why, why should she be a stopped your honor? First of all, she can go to the patent office and Institute of post-grant review and make that argument to the patent office, to an organization that is not, and I'm quoting here from the AIPLA brief. Uh, and of course there are the folks that do this stuff for a living, both for plaintiffs and defendants, where they know that inventors quote loom large and have a greater influence over trial or fact than anybody else. And so Congress has decided that if, if you're going to make a section one 12 challenges and inventor, you can go to the patent office where they are not. Well, she could do that. I mean, I think the point, Mr. Wolf, she could do that, but, but why should she be a stopped under the assigner estoppel doctrine in any event, regardless of that alternative path. I mean, uh, it does seem as though the warranty that she made is not inconsistent with what she's doing now. And I would think that that's the critical question for, for any estoppel doctrine. Well, one response your honor is that the, that no case that I'm aware of in this court or any other has distinguished section one 12, uh, invalidity from any other form of invalidity. So from a purely sorry to say it's a ratification perspective, you can't argue invalidity period. Yeah. I don't really mean to be making a one 12 argument because, uh, I just, uh, I think that this could be true on under one 12 or not true under one 12. I mean, the, the, the, the point of my hypothetical was just to say that, uh, that something meaningful has happened between time one and time two with respect to the claim. If I understand your hypothetical and your question correctly, your honor, I would say that the, the, the, and again, putting the PTAB issue aside, uh, Westinghouse and diamond scientific just did 1988 made clear that as the inventor, you're allowed to say, uh, that if you read the patent the way the plaintiff wants to, it's invalid. And so you should read it in a narrower way. And that's exactly what happened in Westinghouse, uh, and, and, and any number of the ethanol restopel cases.  And if there, if there is a way to, if there's an approach to rebalancing that we want to do prospectively, I'm sure there are good policy reasons behind what your honor is suggesting, but that should be applied prospectively through statute. Thank you. So council on the start of sites, this front, uh, I think I heard the SG's office, uh, God was somewhere in between things. Um, and, uh, as I come at it and tell me what's wrong with this, Westinghouse didn't actually apply the doctrine that acknowledged its existence and allowed the challenges of the scope of the, uh, of the patent Scott paper called it a logical embarrassment. Lear said that Scott had undermined the basis for patent estoppel even more than Westinghouse had. So it read Westinghouse is undermining the basis for patent estoppel. Uh, the world has changed greatly since then, uh, as justice prior pointed out, in terms of employee, employer relations and how these contracts of adhesions are often used against employees. And now we have the patent office itself, refusing to apply patent estoppel, uh, in its own proceedings for an IPR proceedings. So the only place left that this doctor seems to apply is in court. Isn't that a strange state of affairs to, to rest on started as ISIS. Your honor respectfully, I strongly disagree with the premise of your first statement about Westinghouse. Westinghouse did apply. Other than that, do you have any other concerns besides Westinghouse? Well, we have diamond scientific again in 1988, which is the every single currently existing patent assignment is operating under diamond scientific. Unless they get challenged in the patent office and the IPR, which they could be. And then right. Right. Right. And Arista that the court suggested that the Congress on ambiguous. Okay. So, so, so we got that. And then if we're going to monkey with it, if we're going to change it, the solicitor general says we should analogize the patents by deed, uh, sorry, uh, estoppel by deed, which has to do with real estate. And so they only did that because that's kind of what Westinghouse talked about. Why wouldn't the more natural place to look at is, is just plain old estoppel with respect to personal property rather than real estate transactions, uh, given that, uh, if you look at estoppel by deed, there's no need for material misrepresentation. There's no need for reliance. Um, and this would be, this seemingly would be an area in which those would be very critical considerations when a large purchaser is, uh, taking a property off of a smaller inventor, someone who's well positioned to see whether there are any problems with the patent and who may not rely on a stray misstatement, um, or, uh, uh, puffery. Your honor first on the issue of estoppel by deed, estoppel by deed does not just apply to land. It also applies to personal property when there were the formalities of transfer. Uh, so a patent is, uh, as heightened a formal transfer as one can imagine in the property context. So I just want to put a pin in that on the reliance point. When Mr. Chakai to use our specific example applies for a claim when the patent office originally says no. And when Mr. Chakai then successfully fights for allowance of that claim, it's hard to see how that isn't a representation that can be taken seriously under that standard. I, I, I was asking what, why you care about the standard? I understand you think you'd win on it. Thank you. Thank you. Counsel. Justice Kavanaugh. Thank you, chief justice. Good afternoon, Mr. Wolf. I want to explore the differences you might have with the solicitor general. Uh, the solicitor general wants to retain the doctrine of a sign or estoppel, but to limit it. And I want to make sure I understand your concerns about yes, she's position. Um, what, what, how would you describe your differences with the solicitor general position as articulated in the brief and today? Yes, your honor. Uh, and putting aside the reliance issues and the start of the sites issues. If we were talking about an issue, what would we think about it? And I think there's, if I could answer that first at the theoretical level and then give a very specific example at the theoretical level, uh, as worded the SG proposal is more stringent than the invalidity test itself. The question, the law asks when determining the validity of claims sought after an original application was filed as whether they are supported by the original specification. Nowhere in the law can we find a requirement that subsequent claims be materially identical to original claims for section one, 12, be satisfied. So there's an incongruence between the policy, the government, uh, is espousing, and it's a perfectly reasonable policy. If Congress wanted to go there, it just doesn't match up with the test. And let me give the specific example. It is common for a patent examiner to tell an applicant that claims as written will not be allowed, but they're, if they're modified in one way or the other, the patent will issue. If the applicant that takes the PTO up on his suggestion under the government's test, would that result in a loss of protection of asthma or estoppel? So it's a, it's in the real world that presents the Hobson's choice as, as phrase, given the way prosecution actually works. And in fact, pharma it's in its amicus brief noted the unworkability of the government's test. Uh, and it said amended or newly added claims can differ from the original claims in many dimensions, such that I'm evaluating the amount of their difference would be practically impossible. So it's a difficult test to implement. Thank you, Mr. Wolf. Justice Barrett. So Wolf, do you see this case as one about the reenactment canon where we would say there was a settled interpretation of an act and then Congress reenacted the statute without touching it. And therefore, you know, we assume that Congress intended to ratify it or Congress acquiesce in it. Or do you see this as a case in which there was a settled common law background, um, assumption, this assigner estoppel and Congress took the soil of the common law with it into the act. Um, and does it matter which way you see it? The answer is both and no. Well, I guess I think it might matter because the reenactment canon requires a pretty well established line of cases that would put Congress on notice. And as you know, we've talked about a lot this morning, there's uncertainty in the cases, especially ours. Your honor, prior to 1952, we do not believe there's any uncertainty. Westinghouse said it was manifestly intended by Congress. Scott said expressly and explicitly, it was not overturning the doctrine. So when, and then between 1945 and 1952, uh, we saw three cases and two treatises, uh, all unanimously say that Westinghouse was maintained by Scott petitioner. Can't point to a single case because we're not aware of any, the language and you know, this has come up already. I mean, when you have the language and Scott paper, and then in Lear saying that Scott paper undermined any basis for a signer estoppel, I mean, you can't say that it was completely embraced. Well, obviously your honor, Lear was many years, 17 years after the 52 patent act. But it's showing how the courts understood it. So it's still relevant, right? Your honor, I don't think Lear suggested that Scott paper, uh, overruled Westinghouse. I mean, Lear was a policy driven case. It did not address star decisive. It did not address congressional intent, congressional language. And as I suggested, and I don't want to belabor it, but the third circuit and the sixth circuit and the intervening years between Scott paper and the patent act expressly, uh, acknowledge that Westinghouse was the rule. I mean, we have hope basket in 1951 saying the basic rule of estoppel may have been somewhat modified by Scott paper, but it was not abolished. In fact, that case restated the rule. Well, we've, we've been very clear that to the extent, let's assume that for micro slash Westinghouse did, um, lay down a rule, although there's some dispute about whether it did that, let's assume that it did, let's assume that Scott paper undercut it. We've been very clear and telling lower courts that even if our precedents have made, made it a virtual certainty that we would, we would overrule it, but that's our prerogative. So the fact that lower courts continue to apply it wouldn't necessarily mean that as we would view it, that it wasn't a dead letter, but my, my time is up. Thank you. Thank you, your honor. A minute to wrap up. Mr. Wolf. Your honor, the facts of this case comfortably satisfy the policies underlying any of the modifications of Aspen or estoppel proposed by Minerva or the Amici. But for many of the same reasons, the doctrine should not be abrogated. It also should not be modified by this court. At the knees have relied on the estoppel when deciding whether at what price and under what terms they wish to acquire patents and patent applications at the Norris have benefited from that reliance to the enhanced assignment value, the doctrine creates, and they have also been free to reject the doctrine or in whole or in part when negotiating the terms of the assignment, a retrospective change would mean a windfall for Aspen ors and radically undercutting the return on the deal for a quarter centuries worth of Aspen ease. Any modification to ask Norris topple should be made only after careful consideration of the advantages, not just the disadvantage of the doctrine. It should be made after input from all of the stakeholders in the marketplace. Given all this and given this court's precedent, it should be Congress that decides whether what and when such changes should be made. Thank you. Thank you. Counsel. The case is submitted. Oh, no, no. Oh, I'm sorry. Mr. Hockman, you have rebuttal. Thank you. Thank you, Mr. Chief Justice. Excuse me. I will be, I will be as quick as I can here. I'm going to start from the narrow and move to the broad. I just want to correct a couple of, I think, misstatements that Mr. Wolf made. He said repeatedly that claim 31 was obtained. That's not true. Claim 31 was canceled and it was canceled two years, two full years before psychic bought the patent. So it was not. And that's just the way the patent prosecution process goes. Sometimes you learn things after a claim has been given a tentative allowance by the court. And, and you have to make changes. He pointed to the testimony in, in, in, in the, in the record about two Chi at one time, believing that his claim was more than just moisture transport, but that's not the same thing as covering an applicator head with a moisture impermeable device. Those are different points. And I think, and I think that, that, that this is exactly the kind of backward looking overreach that the rules should prohibit. I think a logic's position makes claim 31 a red Herring. It, you know, it, they were very clear today, whatever they can squeeze out of the patent, the assign or is stuck with. And that just doesn't make any sense. You know, Scott allowed Scott paper allowed a party and assign or to say that the patent, that what he was doing was outside of the scope of patent protection because of the time limited nature of patents. There is no principled reason why an assign or shouldn't be able to say that what he's doing is outside the scope of the patent protection, because it's beyond the, it's beyond the breadth of the application that he sold. And that's our argument. And, and, and it's also, by the way, the argument that Westinghouse accepted, and this is toward the end of the Westinghouse opinion. It's page three 54 toward the, toward the bottom there. When it's talking about claim six, claim six in that case was pending at the time of the insight of the assignment was overbroad. And the assigner was nonetheless allowed to dispute the breadth of even narrower claims than the overbroad claim that had been pending at the time. And this is consistent by the way, with Kimball, Kimball says in case after case, the court has construed these laws to preclude measures that restrict free access to formally patent patented, as well as on patented inventions. And it cites Scott paper. That's the point. If you're outside the scope of patent protection, you should be allowed to, that the inventor even in the sign or should be allowed to challenge it. And then in addition, the AIA and IPRs and post-grant review, that's just another reason to abandon a sign or a stopper. That's another one of the significant changes that has taken place, but doctrine doesn't have any legs to stand on. And the, you know, the government pushes towards the real property analogy and a stopper by deed, but it's really important to remember that a sign or a stopper, unlike a stopper by deed is committing property to the public. And so the analogy doesn't hold when, when, when in a stopper by deed, somebody is trying to take back what they had sold, but that's not true here. What we're trying to do is ensure that they get to keep the substantial value of what we sold them, but no more. And to the extent that there's any concern about real mischievous behavior by a sign or equitable estoppel and state law remedies remain available to address them. For all those reasons, we respectfully request that you vacate the judgment and remand with instructions to consider our section one 12 and validity arguments on the merits. Thank you counsel. Now the case is submitted.